And the next case is Vans, Inc. v. MSCHF Product Studio. That would be docket number 22-1006. I was hoping you'd wear those during the argument just for a minute. I would trip and fall if I did, Your Honor. Your Honor, I'm David Bernstein with Debevoise and Plimpton, and we represent MSCHF, which is how our client's name is spelled, or is pronounced. It's an art collective in Brooklyn. Now, this here, Your Honor, is Wavy Baby. And Wavy Baby is a biting commentary on Vans. Vans doesn't like it, but that is not the standard. The district court committed four reversible errors. Number one, there was an utter failure to follow this court's binding precedent in Rogers v. Grimaldi. Number two, there was— What is the biting commentary? So, Your Honor— I have a little trouble—I'm not as familiar with the sneaker world, but I have a little trouble understanding what the commentary is. I appreciate that. Judge LaValle has taught us, in the Yankee publishing case, that not every parody will be understood by everyone. In fact, in that case, he found that the parody there was quite sophisticated and was probably—was unintelligible to many people. But the question is, is there expression? Well, I'm just trying to find out what is the message, what is the parody? So, Vans, Your Honor—this is a shoe called Old School. It's spelled S-K-O-O-L. I'm not sure why that is. But this is the Old School shoe. It is incredibly one of the most popular sneakers in America. It is born out of Southern California counterculture, and it's a skate shoe. It's extremely flat. It's stable. It has a very rubbery sole that allows you to sit on the skateboard. Mischief is an art collective that participates in the consumer market to comment on the consumer market. And they believe that this shoe, this design, which was born out of counterculture, has become bland mass culture. And so in order to comment on that, Mischief took that shoe, they put it through a filter to do what's known as liquify it, and created digitally a very wavy image, kind of like a funhouse mirror. This shoe is intended, Your Honor, this work of art, is intended to comment on the consumerism that has consumers buying this Old School shoe in huge quantities, millions of them. And yet there are so many shoes in the market that look just like it. It's in the record. You could look at Ms. McEnany's declaration, which is at appendix 299, and you'll see numerous types of shoes that look just like this one. And Vance hasn't challenged any of them. What Mischief wants to communicate is that that consumerism has taken hold in the sneaker market. And they do it in multiple ways, Your Honor. So first of all, there's the design of the shoe, extremely wavy. Hopefully, Your Honors will have a chance to actually hold the shoe and see the shoe. So could I ask a question about that? Because we have had that chance. And one of the things that surprised me is I imagined that the waviness would carry through the interior of the shoe. But in fact, you can wear it just like a shoe. You can walk around. It's not, it doesn't have like super arch support or something coming through. Our feet would not, if I tried to put my foot on the bottom of the shoe, that just wouldn't work, Your Honor. Our foot would not work that way. So what Mischief designed to make this shoe is the sole is very wavy, and inside there's a bed where you can place your shoe. So to be clear, you could put this on your foot. I might have. And Your Honor, we can send the right size if you don't have it. But I would warn you to look at the warning label on the bottom of the shoe, which warns you it's extremely wavy. And it warns you that you will tumble if you try to walk in this shoe, certainly if you go down the stairs. I do not recommend... Mischief is selling the shoe. It's competing with fans. This is not a shoe that competes with fans, Your Honor. This is not a shoe that is intended to be worn for skating or to be worn at all, other than as a statement piece, other than as a work of art. You sold several hundred, Mischief sold several hundred pairs. Actually, 4,306, Your Honor. But it's not competing with... It is not because... $220 a pair? First of all, this shoe is, I think, about $60, $65. But it's not about... The question with competition, Your Honor, is this a shoe that's a substitute for what Vans produces? A ultra-functional, very trendy, but ultra-functional skate shoe. That's not what this is. And Mischief tells us that in multiple ways. But even if it's not intended to replace the old school shoe, isn't the question whether there's a likelihood of confusion, whether consumers will think that it is a Vans shoe? So there's two questions, Your Honor. And I would say we'll put it into two buckets. The first question is, is this likely to cause confusion? Is it something that people would believe comes from Vans? And we submit the district court is legally and clearly erroneous there. And I go through that in our brief. But even if that were true, even if that were true, that's exactly the point where this court's precedent in Rogers v. Grimaldi takes hold. What this court said is that parity and expression are so important under the First Amendment that sometimes the trademark laws have to yield. And in the old Farmer's Almanac case that Judge Revato had... Has Rogers been applied to any consumer products other than movies, films, songs, video games? It has, Your Honor. First of all, I'll say video games is new. For the longest time, video games were not considered to be protected by the First Amendment. And now they're well covered. And now there have been a number of Rogers cases. But they're also... What consumer products have involved cases where a court said Rogers applies? So in the VIP products case in the Ninth Circuit, it was a rubber dog toy, a $20 rubber dog toy that had commentary and humor on it. And the Ninth Circuit held... Is that the Jack Daniels case? That's the Jack Daniels case. Exactly, Your Honor. Also in the Ninth Circuit, in the Empire case against Fox, that involved the trademark Empire. And there Rogers was applied to champagne glasses. In the University of Alabama case, Rogers was applied to calendars. And even in the Northern District of New York here... Has it been applied in a case where the products were competing against each other in the same market? I know you disagree with that assumption, but has it been applied in such a scenario? Rogers itself, Your Honor. Rogers was... Ginger Rogers was complaining about all of the movies she made and starred in. The Fellini film was a film. In Cliff Notes in this court, Your Honor, it was spy notes versus Cliff Notes. They were books that were being sold. And by the way, it's not 4,000 books. In the Cliff Notes case, there were 150,000 books. And this court found that Rogers applies and it protects that. Wait a minute, what the court said when it said Rogers applies is it says that there's a balancing test. The court then went on in Cliff Notes, didn't it? To say that the way that you apply that balancing test is to essentially infuse it into the application of the polar rate factors in assessing the likelihood of confusion. It didn't say if there's expressive content, it overrides the risk of confusion. Am I misunderstanding? I think that is incorrect, Your Honor, and I'll tell you why. I believe there's two different buckets. And actually, I'm going to go back to George Duval because I think Yankee Publishing so well signified what this is about. On the one hand, we have parodies that are so obvious that when you do the likelihood of confusion analysis, no one's confused. For example, in the Louis Vuitton against Meyer the bag case that this court recently had, the court looked at it and said, come on, no one is going to confuse this as being a Louis Vuitton. There, it was a canvas bag that had an image of what looked like a Louis Vuitton. Here, we have a work of art in the form of a sneaker, which it's accompanied by a manifesto that explains the artist's intent. And I'll try to come back to you, Judge Chin, on that to talk more about that. What do you say to the finding of the district court that this is, well, Wavy Baby is a consumer product. You sold as many of them as you could, and it was in the thousands. And that is not something that sounds or it seems conceptually like a work of art. So, Your Honor, I appreciate there was a time when we didn't think video games were work of art. Today, sneakers are works of art. This work has been invited to be displayed in the Perrotin Gallery. And Mr. Perrotin has put an amicus brief in. The Perrotin Gallery is one of the most well-respected art galleries in the world. This sneaker is supposed to be shown in the gallery in a mischief show in November. This shoe, this work has been invited to be displayed at Art Basel in Miami in December, one of the world's foremost art fairs. And I would encourage Your Honors to read. So you would say that because it gets displayed at Art Basel, that it doesn't matter how many pairs you sell, you can saturate the market. The number of pairs we sold is not relevant to the question of whether it's art. I can't imagine how many millions of images there are of Mona Lisa out there. That doesn't take away from the fact that it's a work of art. And artists routinely create limited editions. And to one of your points, Your Honor, we did not sell as many of these as we could. We had a one-hour drop. The only people who could participate in the effort to buy this had to know about mischief, had to download the app, had to register, had to sign on during the special one hour, and the demand far outstripped the supply. That has to do with whether people were misled. But the other point, I mean, it definitely goes to the performance nature of the art. And it definitely goes to the fact that these consumers knew that they were getting something from mischief, not from bans. But the other thing, Your Honor, is this art collective, this was a very difficult project for them to create. And they had thousands and thousands and thousands, I believe it was more than 10,000 people who entered the raffle to try to buy one. And we only had 4,300 to sell. So we didn't sell all we could. But even if we sold more, Your Honor, the test of art is not how many we sold. The test of expression is, is there an expressive element here? And to go back to Judge Chin's very first question, from the shape, from the warning label, from the logo of a baby falling off of a Segway, which ties into our fraught relationship. There's probably an expressive element to many consumer products. And you're essentially arguing that if any consumer product has some expressive element to it, that gives them license to use someone else's mark. No, Your Honor, that's not the position we're taking today. So I appreciate that there are going to be hard cases. There are going to be cases when courts are going to have to decide, does the expression predominate here, or does the commercial nature of this predominate? And the case that this court had that makes that distinction is Mastro Vincenzo, which we cite in our reply brief. And in Mastro Vincenzo, the question was, is the sale of T-shirts on the streets of New York something that is artistic and protected by the First Amendment or not? And this court said that in that case, the T-shirts, although a shirt can just be something that's functional, but in that case, the T-shirts were overwhelmingly expressive as opposed to overwhelmingly just commercial. That's the distinction. Now, I would submit this case isn't a close case. I mean, the courts have shown that they're capable of making those distinctions. In the Avella case, the court found that the T-shirt bearing Marilyn Monroe, that was just a commercial enterprise. Yes, of course, there's some expression in having an image of Marilyn Monroe in a shirt, but that shirt was just to sell a shirt that had an image of her. There was no expression. And the Harley-Davidson case also, Your Honor, this court showed that it's very capable of distinguishing between claims that are pretextual claims of parody and real expression. So, Your Honors, this case, though, is not even close. When you combine the fact that this comes from a well-known art collective, that you have briefs from famous artists, gallery owners, auction houses, telling you about the art here. Respectfully, what, again, Judge LaValle told us is judges really aren't literary agents. Judges are not the ones who should decide, is this good art or not? This is a shoe that has been invited to be in these extraordinary galleries and shows coming up. It was accompanied by a manifesto. Wrap up this thought. I will, Your Honor. It was accompanied, I'd say, by a manifesto that itself helps explain the artist's idea and statement. And I think what I'll end with right now, Your Honors, is what the manifesto ends with. In a reference to Rene Marguerite's The Treachery of Images, the manifesto says, C'est n'est pas un chasseur de skate. This is not a skate shoe. And that, Your Honor, is all part of the expression and the message. And I will look forward to coming back for my rebuttal. Thank you. Ms. Wheatley. Good morning. May it please the Court, I am representing the plaintiff appellee Vans and VF Outdoor. This case is about whether a self-described actual sneaker brand, Mischief Sneakers, and I'm quoting mischief there, that is, quoting mischief again, moving from art pieces into a, quote, straight sneaker space, can blatantly copy its competitor Vans trademarks and trade dress, cause consumer confusion as to source, and claim a right to do so under the First Amendment. We submit that the answer to that question is no, and that the district court's issuance for the preliminary injunction should be affirmed. One of the things that struck me in going through the record, and I'm sorry I don't have a site that I can throw up, but those pages where they had the pictures of all of these other shoes, and I was struck by how many shoes looked so much more like the Vans old school. You know, the swoosh was just slightly different, or the racing stripe was thinner or not, than this. And I'm trying to figure out why those shoes, which looked so much more like the old school, weren't infringing, and this, which looks pretty different, is. Your Honor, my first comment on that would be that on appeal, mischief has not challenged the district court's finding that the Vans old school has secondary meaning, that the trade dress elements are protectable. So I would say that that issue is not before this court. I would also point out that it is factually incorrect that the other shoes shown in some of mischief's submissions were not successfully challenged by Vans. I, in fact, challenged one of those shoes myself in court, and they were enjoined from being sold. Can you tell us which one, or? The Walmart shoe. Okay, thank you. But the key point is that the district court found that Vans had shown secondary meaning in the old school trade dress here, which means that you can recognize it as a Vans shoe. And in this case, the proof is in the pudding. Mischief has acknowledged that you can recognize this, the mischief shoe, as a Vans shoe, which would not be possible unless the trade dress is protectable, it is distinctive. If it looked like a bunch of other shoes, no one would be able to discern what mischief is trying to do here. And the one thing that is very clear from the record is that everyone knows this is a takeoff on the old school. But if everyone knows it's a takeoff on it, then surely everyone knows that it isn't an effort or a stab at humor or parody. Your Honor, I would say no. The district court discussed the fact that what this appears to be is a collaboration. And by takeoff, I didn't mean everyone knows it's a knockoff. It looks like this is some sort of special version, special edition, collaboration of the old school shoe. But could anyone think that if they bought it at the point of purchase, which is a website where the thing is available for one minute and everybody is piling in to buy these things, which are virtually unwearable, and they know who they're buying it from, and they're buying it from something called mischief, MSCHF. I mean, you'd have to know about this collaborative, and you'd have to know what they do in order even to go to the website, let alone to buy something from it. And when you get it, it comes with all sorts of things. It comes with a manifesto that basically conveys the artistic purpose of it. I mean, as I look at it, what it would convey to me, and I don't do what the Vans shoes do, but what it conveys to me is that it's making fun of the objectification of the only consumer product of sneakers to be a collectible, and that that is absurd and a sign of the cultural crisis. MS. HAUSERMAN Your Honor, two points to make on that. Going to the website tells you that MSCHF is selling the shoe. It doesn't tell you that MSCHF was not collaborating with Vans or did not receive permission for Vans. So that would be one point. And in fact, sneaker companies do collaborate, and so it might be a different seller. The second point would be the Lanham Act is also concerned with post-sale confusion, and the District Court specifically considered this. And in fact, some of the evidence on the record was sneaker heads discussing the high likelihood of post-sale confusions. When you see this shoe from across the street, you think Vans, and there's nothing to tell you from any distance that it is not a Vans shoe. I would say, even when you inspect it, because it wholesale copies the Vans trade dress and some of the trademarks, you still don't know that it's not just a collaboration where they've meshed the branding together. In fact, the sole is a trademark sole. They didn't alter it in any way. They just waived it. Well, what is the nature of the protection for a manufacturer such as Vans in being protected against that part, that aspect, third-party confusion when they see it? Um, the Lanham Act, the harm there... Yeah, what's the harm is the question. The harm would be reputational harm and also the loss of the manufacturer's ability to control how it communicates with consumers, who it collaborates, its reputation in the marketplace. But what if the idea of the wavy baby is to comment on how Vans communicates with consumers by putting out celebrity limited editions of sneakers and that that is absurd? Your Honor, that may have been the idea, but that is not what they conveyed. And that gets us right to why the district court's analysis was correct. But if that's their idea, then that's an artistic idea, is it not? The idea, certainly. But what the First Amendment protects is not ideas, it protects speech. And speech has to convey something, which is why the parody analysis this court has used to protect the First Amendment interest in comment. And part of the test is, is there a comment being conveyed? Is there some discernible satire or commentary or joke? Is there something to tell the consumer simultaneously that this is a Vans shoe, but that it's not from Vans and that instead it's a commentary on Vans? And the district court carefully considered this and found you cannot see the comment here. And what happens is, when you get down to where you cannot discern the comment, well, there's no longer any First Amendment expression to protect. All you're left with is a misleading identifier of source, which is never protected, and an aesthetic alteration of a trademark. And the First Amendment does not protect the right merely to distort a trademark. It protects speech. And so there's no speech here to protect, and that's what the district court found. But so that would be why we say the parody analysis isn't right to apply here, as the district court did. And the district court, of course, was balancing the First Amendment. There was an entire... Do you think the district court actually found that? I struggled a little bit to understand what the district court found. It started that paragraph in the First Amendment that said, whatever its expressive merits. And then it went on to say it kind of fails as a parody in the sense that it doesn't adequately communicate that it's not Vans. But did the court actually close the loop as to whether or not it was an expressive effort or an expressive product? The court did not make a specific finding distinguishing the wavy baby sneaker and putting it into an expressive versus not expressive bucket. I would say because all fashion has expressive elements. You really can't say that fashion doesn't have expressive elements. But of course, all fashion is not judged by the Rogers test. In fact, this court has never judged items like this under the Rogers test. And the few times this court has actually applied the Rogers test, it's been strictly limited to titles of books. That is what it was designed for. And Rogers itself acknowledged that the question of a title was very different than the ordinary labeling of an ordinary commercial product. And Rogers, in fact, used that express term. So the district court did ultimately decide that this was an unsuccessful parody. And so there was no First Amendment expression to protect. And that on balance, the primary message was a misleading one as to source. What's the difference between a successful parody and an unsuccessful parody? That people know it's a parody? Yes, Your Honor. The difference between primarily, yes. A successful parody evokes the original. So people get what it's about. But then it tells people that there's a comment on the original or a joke about the original. Well, if the comment is about sneaker culture, and there apparently is such a thing, if it's a comment about sneaker culture, then wouldn't that Vans iconic old school shoe be the perfect object of parody to distort that, to tell people that that, which is the iconic symbol of sneaker culture, can be made absurd and useless for its intended purpose? There may be, certainly, a permissible way to parody the Vans old school where you're not creating source confusion. But that's not what mischief did here. Mischief created source confusion. And I think it's- But it's not source confusion at the point of advertising, nor is it at the point of purchase. It is if people are wearing it in the street. But my understanding is it's a collectible. So people don't usually use collectibles. Your Honor, I would disagree with that. The evidence of source confusion relied on by the district court and produced in the case primarily occurred before the wavy baby was ever on sale. So this was not coming from people seeing it from across the street. This was coming from people seeing mischief collaborators Taiga's social media. This was coming from people seeing mischief social media and its website. So we have evidence that people were confused as to source because they're accustomed to these collaborations. Vans and other sneaker companies do these things all the time. So there absolutely was advertising confusion. And there was point of sale confusion. Because that was really the only type of confusion we could have seen prior to the sale. And that's when that evidence was produced. I did want to get back to one other point regarding the parity analysis. A key question here is, did the district court err? And we would submit that the district court's analysis was entirely consistent with this court's analysis in the later cases of the Hormel case, the Harley Davidson case, where this court considered when another company had used a competitor's trademarks as trademarks, as source identifiers, as done here, is there a clear parodic comment that would alleviate confusion? And certainly in Hormel, the court found yes, there was. In Harley, the court found no, there was not. The Harley court even cited Cliff's notes but did not apply the Rogers test. And I would add that the Harley- Do you think that in Cliff's notes, the court applied the Rogers test? Your Honor, in Cliff's notes, the court did not apply the Rogers test. Cliff's notes, the court explicitly found that the second prong of Rogers, whether it was explicitly misleading, was not applicable in the context of a trademark infringement claim. Because Rogers was a false advertising, false endorsement claim. So in Cliff's notes, as you pointed out earlier, the court went on to analyze likelihood of confusion informed by parody analysis. So we would say that's essentially what the district court did here. In fact, I don't know that this court, in a published opinion, has ever, after Rogers, applied the precise test that mischief is asking for here. Instead, subsequent trademark infringement cases, even involving books or movies, this court has applied the Polaroid factors and looked to the question of parody. So I think I am near the end of my time. So I would just close by saying, mischief has chosen to enter a straight sneaker space. That's what mischief calls it. So regardless of their artistic bona fides, they have to apply by the Lanham Act when they are using their competitors' trademarks and trade dress. They've created consumer confusion as to source. The district court correctly found that that was what had occurred and was what was likely to occur. And correctly issued the injunction we would ask this court to affirm. Thank you, Ms. Weaver. We'll hear from Mr. Bernstein on rebuttal. I'd like to start with Judge Jacob's question. What's the difference between a successful and an unsuccessful parody? Because I think that answers many of the points that Vance has proposed here today. If it's a successful parody, it's like Cliff Notes. People get the joke. They're not confused. That was the case in the Hormel case, where there was a Muppet called Spam in Muppet Treasure Island. People got the joke. They weren't confused. We submit that people, the market gets this joke. Spam sued on that. They did sue. They did sue. And this court said, no, there's no confusion. And we didn't need to go to Rogers because we don't need to constitutionalize every trademark case. If there's no confusion, we don't have to assess Rogers.  they sold tchotchkes. I mean, it wasn't just the movie. As with any movie, there's merchandising that follows. But they didn't sell cans of ham. They did not sell cans of ham. And this, Your Honor, is c'est n'est pas un chasseur de skate. This is not a skate shoe. One of the interesting things about the manifesto is the manifesto, people aren't passing it out on the street as they go around. It's not being handed out. Can we look at the manifesto as informing the message of the shoe or do we have to look at the shoe in its own sort of context? The Supreme Court told us in Campbell's, in Campbell against Accu-Froze, that when it comes to parody, context is everything. The context of this work is all of it. It's the way you buy it on the Mischief App. The manifesto is on the Mischief App when you buy it. It's the way you get the raffle ticket. It's the box it comes in. And by the way, this box says it's a collaboration between Mischief and Tyga. It's not a collaboration with Vans. It would not be reasonable for people to believe it's a collaboration with Vans when we're telling people on the website, in the music video, the tiger launched wearing the shoes, that this is a collaboration with Tyga. Is that the Doja Cat video? It is indeed, Your Honor. I can't get that song out of my head some days, which is unfortunate. But because context is everything, the manifesto is part of it. And I must take issue with this notion that there's post-sale confusion. There is zero evidence in this record of post-sale confusion. When this shoe, which was only bought by some 4,300 people across 50 countries of the world, across every state in this country. So this shoe is quite rare to see it. You certainly will not see it walking down the street. But you could, right? If you win. If you win. This could be the new cool thing to wear to sort of skewer Vans and wear your wavy baby. The only place that you would reasonably wear this is on the red carpet or someplace where you want to take a picture of yourself and post it on social media. And they do have images of people wearing it on social media to say, look what I got. But this shoe is trading for multiples of what it cost. It's trading on eBay for $650, Your Honor. And it's trading as a work that comes from mischief. No one thinks this is from Vans. And so the successful parody point, Your Honor, is if you think this is like my other bag, it's a successful parody. And there's just no trademark infringement. And I think the district court was wrong. And by the way, I want to say something else that Ms. Wheatley, I think, maybe misspoke. We did not include that Walmart shoe that they challenged in our declaration. Every one of the shoes in our declaration was not challenged as far as we know. But the Walmart shoe, we definitely did not include. And it's not just the four shoes in our brief. But why do they have to challenge every shoe that tries to score off them? They don't have to. And I'm not suggesting that they do. But what I do believe it goes to is it goes to the strength of the mark. If there are millions of other skate shoes out there that look just like this, with maybe a slightly different version of this jazz stripe. I mean, they're all sneakers. They have a lot of things in common. But consumers understand that one comes from Converse, and one comes from Revenge, and one comes from Vans. When people see that marketplace, we would submit that the strength of this design is quite low. I'm not saying it doesn't have secondary meaning.  if they don't look at that and evoke Vans, right? Exactly. We want them to know this is a joke on Vans. Let me be very clear. We took the Vans look, and we liquefied it, and we put it through the funhouse mirror, and we have this crazy squiggly. I would submit this isn't use of the Vans marks. This is the transformation of the Vans trade dress. But I want to get to the second point, which is, let's say I'm wrong. Let's say there is some confusion. And do we owe the district court deference on that determination? You don't. So each of the individual likelihood of success factors under Polaroid is clear error. I would say, actually, it is clear error on actual confusion, because none of the posts that they cite, none of the social media posts, are purchasers. Yes, I appreciate that someone may have seen the Tiger Doja Cat video and may have said, oh, wow, is that a Vans collaboration? But respectfully, they're not purchasers of this work. And so it's not purchase confusion, which is what the Lanhamet gets to. But let's say I'm wrong. And by the way, this court, in the Tiffany against Costco case, this court made clear that you can de novo consider the weighing of the Polaroid factors. And when you look at the weighing of the Polaroid factors, this court, as a matter of law, can say this is not confusing. But even if you don't get there, even if you believe this parity just isn't so clear, then I go back to what the Supreme Court said in Campbell. The First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed. And the Supreme Court appropriated that from George Leval. And he said that first in the Yankee publishing case. So if we're in a situation where this work of art is maybe too sophisticated of a parity of expression for everyone to understand, that some people are confused, that was the case in Rogers and Grimaldi. There was survey evidence that I believe it was 29% or 30% of consumers were confused into believing that Ginger Rogers had something to do with it. And the court said, nevertheless, the First Amendment is what applies. And when you apply Rogers against Grimaldi and those two standards, I think you have to find that this is protective. I know I'm low on time. No, you're past time. OK. Your Honors, thank you very much. Appreciate it. Appreciate it. Thank you. Thank you for your arguments. We'll take it under advisement. Excellent. Interesting case.